UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x
ALEXSAM, INC.,                                    :
                                                  :
                          Plaintiff,              :      <u>REPORT &</u>
                                                  :      <u>RECOMMENDATION</u>
             -against-                            :      15-CV-2799 (ILG) (SMG)
                                                  :
MASTERCARD INTERNATIONAL INC.,                    :
                                                  :
                          Defendant.              :
-------------------------------------------------------------------- x
GOLD, STEVEN M., U.S.M.J.:

INTRODUCTION

This diversity action for breach of contract is brought by Alexsam, Inc. ("Alexsam")

against MasterCard International Inc. ("MasterCard"). Alexsam's breach of contract claim arises

out of a license agreement entered into by the parties in May 2005. Complaint, ("Compl.") ¶ 1,

Docket Entry 1. Alexsam holds two patents: United States Patent No. 6,000,608 ("'608 Patent"

or "'608"), entitled "Multifunction Card System," Docket Entry 166-2, and United States Patent

No. 6,189,787 ("'787 Patent" or "'787"), a continuation of the "608 Patent entitled

"Multifunctional Card System" (together "the patents"), Docket Entry 166-3.

Alexsam granted MasterCard a non-exclusive, non-transferable license to use the patents

and to enable others to engage in "Licensed Transactions." License Agreement (the

"Agreement") ¶¶ 1.1, 2.1, Docket Entry 1-6. The Agreement defines "licensed transactions" in

relevant part as those conducted by means of processes "covered by one of the Licensed

Patents." *Id.* ¶ 1.3. In exchange, MasterCard agreed to pay Alexsam royalties for each licensed

transaction and to provide Alexsam with monthly royalty reports identifying the number of

licensed transactions conducted. *Id.* ¶¶ 4.1-4.2. Plaintiff alleges in this action, however, that

from as early as April 2008, MasterCard has repeatedly failed to provide accurate reports and to make payments for licensed transactions as the Agreement requires. Compl. ¶¶ 15, 22-26.

The Agreement defines "licensed transactions" as those covered by the patents. Accordingly, it is necessary to construe the meaning of the patent claims before determining whether MasterCard breached the License Agreement and, if so, to what extent. To that end, after receiving briefing from the parties, the Court held a claim construction hearing on April 20, 2018. *See* Transcript of Civil Cause for Claim Construction Hearing on April 20, 2018 ("Tr."), Docket Entry 174.

Even before the hearing, the parties had stipulated to the construction of several claim terms. After the hearing and in part in response to suggestions made by the Court, the parties stipulated to the construction of additional claim terms. Alexsam Letter dated April 27, 2018 ("Alexsam Letter") at 2-3, Docket Entry 176; MasterCard Letter dated April 27, 2018 ("MasterCard Letter") at 2, Docket Entry 177. These agreed-upon constructions are included in the table of stipulated terms below. Also prompted by a suggestion made by the Court at the hearing, Alexsam—in response to MasterCard's contention that Claim 31 of the '787 patent is indefinite—stipulated that a rejection under Step D of Claim 31 would not be a covered transaction under the license. Alexsam Letter at 3-4.

For the reasons set forth below, I respectfully recommend that the Court adopt the constructions proposed below of the following claim terms, which are the only terms still in dispute: "debit/medical services card" ('608 Patent: Claim 32); "loyalty card" ('608 Patent: Claim 20; '787 Patent: Claim 27); and "preselected information receiving device" ('787 Patent: Claim 31). I also respectfully recommend that the Court reject MasterCard's contention that the phrase "transmitting a rejection code to said point-of-sale device if said pin entered does not

correspond to said identification number" renders Claim 31 of the '787 patent indefinite under 35 U.S.C. § 112(b). [1]

BACKGROUND

The two patents at issue in this case have different titles and claims, but identical specifications. MasterCard's Opening Claim Construction Brief ("Def.'s Mem.") at 1 n.1, Docket Entry 166. The patents have been the subject of much litigation, and other courts have construed some of the claim terms before. Alexsam's Opening Claim Construction Brief ("Pl.'s Mem.") at 4 & n.5, Docket Entry 165. Because a detailed description of the claimed invention is set forth in *Alexsam, Inc. v. Gap, Inc.*, 621 F. App'x 983, 985-87 (Fed. Cir. 2015), only a brief overview is provided here.

In essence, the patents describe a multifunction card system that utilizes existing retail point-of-sale ("POS") devices. '608 Patent 4:14-35. [2] This system is intended to allow the use of various types of prepaid cards, particularly phone cards, gift cards, medical cards, and loyalty cards. '608 Patent, Abstract; Pl.'s Mem. at 3. The novel aspect of the system is its use of Bank Identification Numbers ("BIN") to accomplish transactions using existing POS devices rather than "closed systems" requiring activation terminals unique to each card issuer. '608 Patent 1:66-2:14. In the patented system, each card is assigned a BIN, which allows a retailer to

---

[1] By order dated November 4, 2017, Senior United States District Court Judge I. Leo Glasser referred all nondispositive pretrial matters to me pursuant to 28 U.S.C. § 636(b)(1). Docket Entry 97. There is a split in authority as to whether claim construction is a nondispositive pretrial matter. *Compare Fisher-Price, Inc. v. Kids II, Inc.*, 2015 WL 2401887, at *3 n.1 (W.D.N.Y. May 19, 2015) ("Claim construction questions upon referral are considered as dispositive requiring a report and recommendation pursuant to 28 U.S.C. § 646(b)(1)(B)"), *with Mantissa Corp. v. Ondot Sys. Inc.*, 2017 WL 1373771, at *1 n.2 (S.D. Tx. Jan. 13, 2017) ("Claim construction following a *Markman* hearing has been held to be a non-dispositive pretrial matter appropriate for decision by a United States Magistrate Judge under 28 U.S.C. § 646(b)(1)(A)."), *and SciCo Tec GmbH v. Bos. Sci. Corp.*, 599 F. Supp. 2d 741, 742 (E.D. Tx. 2009) (concluding that claim construction is a nondispositive pretrial matter). Because of these divergent views, and out of an abundance of caution, I render my decision on claim construction as a Report and Recommendation. *See Spinal Concepts, Inc., v. EBI, L.P.*, 2004 WL 5680799, at *1 n.1 (W.D. Tx. Apr. 13, 2004) ("The Court addresses its findings on claim construction by Report and Recommendation due to the potentially dispositive nature of *Markman* rulings.").
[2] Citations to the patents are in Column Number: Line Number(s) format.

remotely add or subtract data, typically a monetary amount or loyalty points, using a POS device. '608 Patent 4:36-46—5:9-14. Existing POS devices were, at the time of the invention, pre-programmed to recognize BINs. *Alexsam, Inc. v. Humana Inc.*, 2009 WL 2843333, at *1 (E.D. Tx. Aug. 28, 2009).

Figure 2 of the patents graphically illustrates "the various ways in which a retail point-of-sales device might connect to the multifunction card system." '608 Patent 4:7-9.

FIGURE 2



DISCUSSION

I.    Claim Construction Standard

The claims of a patent "define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir.

2004).  Thus, when determining the scope a patent, the claims are of "primary importance, in the effort to ascertain precisely what it is that is patented."  *Phillips*, 415 F.3d at 1312 (quoting *Merrill v. Yeomans,* 94 U.S. 568, 570 (1876)).

Claim construction is a question of law.  *Markman v. Westview Instruments*, 517 U.S. 370, 372 (1996) (holding that claim construction is "exclusively within the province of the court").  Courts construe claim terms by ascertaining their "ordinary and customary meaning," or "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  *Phillips*, 415 F.3d at 1312-13.  When construing claims, a court should focus its analysis on the patent's intrinsic evidence, which includes the patent claims themselves, the specification, and the patent's prosecution history.  *Id.* at 1315-17; *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015) (describing intrinsic evidence).  Indeed, a "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Phillips*, 415 F.3d at 1313.  Thus, "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims."  *Id.* at 1314.  Likewise, a patent's specification informs the meaning of its claims;  nevertheless, limitations from the specification should not be read into the claims. *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306 (Fed. Cir. 2003).

## II. Stipulated Claims

The parties have stipulated to the construction of the following claim terms. Final Joint Claim Construction Chart and Stipulation, Docket Entry 169; Alexsam Letter at 2-3; MasterCard Letter at 2.

| Claim/Term | Agreed Construction |
|---|---|
| "bank processing hub computer"<br><br>('787 Patent: Claims 27, 31) | "A computer, other than a processing hub, that is maintained by a bank, that facilitates the card transaction and that is remote from the pre-existing standard retail point-of-sale device" |
| "banking network"<br><br>('608 Patent: Claims 20, 32; '787 Patent: Claims 27, 31) | "A set of interconnected computers used by banks and financial institutions for purposes of conducting and processing financial transactions, and which incorporates and utilizes a processing hub" |
| "processing hub"<br><br>('608 Patent: Claim 20) | "A computer which provides front-end point-of-sale device management and message processing for card authorizations or activations" |
| "unmodified existing standard retail point-of-sale device" | "A terminal for making purchases at a retail location of the type in use as of July 10, 1997, that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system" |
| "unmodified existing standard point-of-sale device"<br><br>('608 Patent: Claim 32) | "A terminal for making purchases of the type in use as of July 10, 1997, that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system" |

| | |
|---|---|
| "bank identification number approved by the American Banking Association for use in a banking network" / "said identification number comprising a bank identification number approved by said American Banking Association for use in a banking network"<br><br>('608 Patent: Claims 20, 32; '787 Patent: Claims 27, 31) | "A numeric code which identifies a card-issuing financial institution and that is sanctioned by the American Bankers Association" |
| "Decrypting"<br><br>('787 Patent: Claims 27, 31) | "Decoding or deciphering" |
| "pre-existing standard retail point-of-sale device"<br><br>('787 Patent: Claims 27, 31) | "A terminal for making purchases at a retail location of the type in use as of July 10, 1997" |
| "swiped / swiping / is swiped through"<br><br>('608 Patent: Claims 8, 20; '787 Patent: Claims 27, 31) | "Passed or slid through an electronic card reader / passing or sliding a card through an electronic card reader / is passed or slid through an electronic card reader" |
| "means for crediting an account corresponding to the loyalty card with loyalty points based upon the purchase data"<br><br>('608 Patent: Claim 20) | *Corresponding Structure*:<br><br>**'608 Patent: Col. 5, lines 9-12; col. 9, line 11-col. 10, line 6; Figures 1 and 2 (element 103)**<br><br>**'787 Patent:** n/a<br><br>Function: crediting an account corresponding to the loyalty card with loyalty points based upon the purchase data<br><br>The means for crediting the account is the processing hub 103. |

| "means for increasing the balance of the account corresponding to the electronic gift certificate card by the electronic gift certificate recharge amount"<br><br>('608 Patent: Claim 2) | *Corresponding Structure*:<br><br>**'608 Patent: Col. 5, line 27; col. 5, lines 66-67; col. 7, line 65-col. 8, line 2; Figure 2 (element 103)**<br><br>**'787 Patent:** n/a<br><br>Function: increasing the balance of the account corresponding to the electronic gift certificate card by the electronic gift certificate recharge amount<br><br>The means for increasing the balance of the account is the processing hub 103. |
|---|---|
| "means for receiving electronic gift certificate card recharge data from an existing standard retail point-of-sale device when said electronic gift certificate card is swiped through the point-of-sale device, said electronic gift certificate card recharge data comprising the unique identification number of the electronic gift certificate card and an electronic gift certificate recharge amount"<br><br>('608 Patent: Claim 2) | *Corresponding Structure*:<br><br>**'608 Patent: Col. 4, lines 7-9; col. 5, line 37-col. 7, line 33; Figure 2 (elements comprising "combinations of structure which form pathways for receiving the data from the POS device. These include the various combinations or the retailer processors, the bank processors, the debit network, and the processing hub as shown in Figure 2.")**<br><br>**'787 Patent:** n/a<br><br>Function: receiving electronic gift certificate card recharge data from an existing standard retail point-of-sale device when the electronic gift certificate card is swiped through the point-of-sale device, the electronic gift certificate card recharge data including the unique identification number of the electronic gift certificate card and an electronic gift certificate recharge amount<br><br>The corresponding structures include the pathways for receiving the data from the POS device, which include the various combinations of the retailer processors, the bank processor, the debit network, and the processing hub as shown in Figure 2, and equivalents thereof. |

| | |
|---|---|
| "means for receiving loyalty data from an unmodified existing standard retail point-of-sale device when said loyalty card is swiped through the point-of-sale device, said loyalty data comprising the unique identification number of the card and purchase data"<br><br>('608 Patent: Claim 2) | *Corresponding Structure*:<br><br>**'608 Patent: Col. 4, lines 7-9; col. 5, line 37-col. 7, line 33; Figure 2 (elements comprising "combinations of structure which form pathways for receiving the data from the POS device. These include the various combinations or the retailer processors, the bank processors, the debit network, and the processing hub as shown in Figure 2.")**<br><br>**'787 Patent:** n/a<br><br>Function: receiving loyalty data from an unmodified existing standard retail point-of-sale device when said loyalty card is swiped through the point-of-sale device, said loyalty data comprising the unique identification number of the card and purchase data<br><br>The corresponding structures include the pathways for receiving the data from the POS device, which include the various combinations of the retailer processors, the bank processor, the debit network, and the processing hub as shown in Figure 2, and equivalents thereof. |
| "information retrieval card"<br><br>('787 Patent: Claim 31) | "A card that is used to receive information specific to the cardholder or someone associated with the cardholder with respect to the information retrieved." |
| "medical card"<br><br>('608 Patent: Claim 32) | "A card that allows access to a database containing medical information specific to the cardholder or someone associated with the card holder with respect to the medical information accessed." |
| "medical information number"<br><br>('608 Patent: Claim 33; '787 Patent: Claim 34) | "A number used for identification purposes associated with a record in a database containing medical information specific to the cardholder or someone associated with the cardholder with respect to the medical information accessed. " |
| "recharge data"<br><br>('608 Patent: Claim 2) | "Data related to a purchase of additional value for a previously activated prepaid card." |
| "recharge amount"<br><br>('608 Patent: Claims 2, 61) | "The amount of additional value added to a previously activated prepaid card." |

### III.   Disputed Claims

Three claim terms remain in dispute.  Each is addressed in turn below.

### a.   "Debit/medical services card"

| **"debit/medical services card"** ('608 Patent: Claim 32)<br><br>Claim 32: "a multifunction card system comprising:<br>a.  at least one debit/medical services card having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;" | | |
| --- | --- | --- |
| **Alexsam's Proposed Construction** | **MasterCard's Proposed Construction** | **The Court's Construction** |
| A card that can function as part of a multifunction card system as both a debit card and a medical services card, depending upon the database it is directed to access. | A card that can function differently as part of a multifunction card system as both a debit card and a medical services card, the different functions depending upon the database the system is directed to access by the user. | A card that can function as part of a multifunction card system as both a debit card and a medical services card, the different functions depending upon the database the system is directed to access when the card is used. |

The parties' differences over the construction of the claim term "debit/medical services card" have narrowed since the claim construction hearing.  Alexsam Letter at 2; MasterCard Letter at 3.  The remaining differences are over (1) whether it is clearer to refer to the card as performing different functions or functioning differently; (2) whether it is the card or the system that is directed to a particular database; and (3) whether the definition should be limited to require that the user of the card be the one who directs the card or system to access one database or another.

The parties' dispute over "functions differently" is largely a semantic one.  Essentially, the card itself does not function differently depending upon how it is used; each time it is used it

is simply swiped through a POS device. Rather, it is the system that functions differently. When used as a debit card, the card directs the system to access one database; the card directs the system to access a different database when it used as a medical services card. *See* Figure 2 (showing different preferred embodiments). No matter what function is being accomplished, however, the card itself is always used in the same manner: by being swiped at a POS terminal. The central point any construction must capture is that the system is capable of doing two different things: enabling the card to act as a debit card and as a medical services card.

In this context, and as I pointed out at the claim construction hearing, I perceive a risk that a jury will be confused by the phrase "functions differently." Tr. 76:12-22. A finder might conclude that, for a card to "function differently," there must be something different about how the card is deployed or the manner in which it is used. For example, a jury could mistakenly understand that one way for a card to function is by swiping it through a terminal, another is by being held against a card-reading device, and a third is by entering the card number and security code into a computer. The invention, however, clearly claims a card that functions—in this sense of the word—the same way regardless of the purpose for which it is used. It is therefore clearer to say that the card performs different functions than it is to describe the card as functioning differently. Similarly, because it is the system and not the card that is functioning differently, it is clearer and more accurate to say, as MasterCard proposes, that the system—not the card—is directed to access one database or another.

Finally, as Alexsam argues, the phrase "directed . . . by the user" in MasterCard's proposed construction is ambiguous. As Alexsam contends, the user need not be aware of which database the system is accessing or how the system operates. Alexsam Letter at 2. Moreover, to the extent the term "user" implies the cardholder, MasterCard's proposed definition may be

inaccurately restrictive; it is easy to envision circumstances in which a cardholder surrenders the card to an employee of a medical services provider or retail establishment, and the employee then enters information through the POS terminal that directs the system to access a particular database. To avoid any confusion on this point, the Court's construction simply refers to "when the card is used" rather than identifying or imputing any specific intention to the user.

The Court's construction is supported by the specification, which states:

> In order to let the system 108 know which function or functions the card is serving in any particular transaction, a code is entered into the PIN pad of the POS device from which the transaction is originating. Alternatively, the system 108 could prompt the user to indicate the proper card function and the databases that must be accessed. Based upon this input, the system 108 carries out the appropriate actions. The system 108 can access each of the databases discussed above . . . .

'608 Patent 10:54-62.[3] As can be seen from this excerpt, the specification refers to the functions the card serves, not to the card functioning differently; refers to the system, not the card, accessing databases; and describes a code being entered into a PIN pad without identifying or describing the intent of the person making the entry.

Accordingly, I respectfully recommend the following construction of the term "debit/medical services card": A card that can function as part of a multifunction card system as both a debit card and a medical services card, the different functions depending upon the database the system is directed to access when the card is used.

---

[3] "108" refers to a designation on Figure 1 of the patent specification.

*b.* "Loyalty Card"

| **"loyalty card"** ('608 Patent: Claim 20; '787 Patent: Claim 27) | | |
|---|---|---|
| "Claim 20: A loyalty card system, comprising:<br><br>a.  at least one loyalty card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a banking network, said identification number corresponding to the loyalty card system;<br>b.  means for receiving loyalty data from an unmodified existing standard retail point-of-sale device when said loyalty card is swiped through the point-of-sale device, said loyalty data comprising the unique identification number of the card and purchase data; and<br>c.  means for crediting an account corresponding to the loyalty card with loyalty points based upon the purchase data"<br><br>Claim 27 of '787: "A method of adding points to a loyalty card…" | | |
| **Alexsam's Proposed Construction** | **MasterCard's Proposed Construction** | **The Court's Construction** |
| A card used to reward consumers, where the information regarding the consumer's loyalty account is transmitted at the point of sale in real time as a purchase takes place | A card, separate from a card used to purchase goods or services, used to reward a consumer's loyalty account at the point of sale in real time as a purchase takes place. | The Court adopts MasterCard's proposed construction. |

The material difference between the parties' proposed constructions concerns whether a "loyalty card" must be separate from a card used to purchase goods or services.[4]

---

[4] The parties originally proposed different constructions for this term. *See* Pl.'s Mem. at 16; Def.'s Mem. at 16-18. Alexsam proposed a new construction in its responsive brief. Pl.'s Reply at 18-20. Accordingly, I afforded MasterCard an opportunity to submit additional briefing, Order dated April 17, 2018, which it did. MasterCard Letter dated April 19, 2018, Docket Entry 170. The parties were then permitted to submit additional briefing after the claim construction hearing was held, Order dated April 24, 2018, which they did. MasterCard's Supplemental Letter Brief ("Def.'s Supp."), Docket Entry 181; Alexsam's Supplemental Letter Brief ("Pl.'s Supp."), Docket Entry 184.

Both sides invoke the patent specification for support. As MasterCard points out, the specification distinguishes between "separate" loyalty cards and a "loyalty feature add-on" to other types of cards; where it introduces "loyalty cards," the specification states the following: "Not unlike the loyalty feature add-on of the Electronic Gift Certificate[] card, the system 108 of the present invention may provide a separate loyalty card much like a frequent flier card that can have points added at virtually any POS device[]." '608 Patent 9:25-31; Def.'s Mem. at 16-17. According to MasterCard, this language in the specification is a powerful indication that a loyalty card—at least as that term is used in the claims referenced above—must be a separate card. Alexsam emphasizes that the specification's use of the permissive term "may" in the phrase "may provide a separate loyalty card," rather than a more restrictive word, indicates that a loyalty card need not be separate from any other card. Alexsam's Responsive Claim Construction Brief ("Pl.'s Reply") at 19, Docket Entry 168.

The Court agrees with MasterCard in large part because its reading of the word "separate" in the specification is the more natural one, and because the patent claims themselves indicate that, when used without modification, the term "loyalty card" refers to a card that functions only in that capacity. As noted above, claim terms are read consistently across a patent, and the wording used in one claim may therefore inform the meaning of another. Here, it is clear from the words used in other claims that the inventor had the capacity to, and did, describe a card with multiple functions, including the functions of a loyalty card, when he intended to do so. Claim 13 of the '608 patent, for example, claims a "multifunction card system . . . wherein a single card with a single identification number can function as an electronic gift certificate card and as a loyalty card." The inference is accordingly strong that, when—as in

Claim 20—the term "loyalty card" is used by itself and not in conjunction with some other type of card or function, it refers to a card that functions as a loyalty card and not in any other way.

Indeed, perhaps understandably given the number of different proposed constructions for "loyalty cards," but nevertheless tellingly, Alexsam itself has described the term "loyalty card" as used in Claim 20 as a separate card; in its reply brief, Alexsam wrote, "[t]he '608 Patent describes, among other things, a system involving a loyalty card that may be part of a multifunction card (e.g. '608 Patent, Claim 58) or be a separate card (e.g. '608 Patent, Claim 20)." Pl.'s Reply at 11.

To be sure, some language in the specification describes the preferred embodiment of the invention as a multifunction card system capable of performing all of the functions the specification describes. '608 Patent 10:49-53. But while many of the patent claims begin by describing "a multifunction card system," '608 Claim 20 begins by describing "[a] loyalty card system." If this difference is to be accorded any meaning, the distinction must be between cards capable of performing multiple functions and those that function only as a loyalty card. The Court therefore concludes that "loyalty card" as it appears in Claim 20 of the '608 patent and Claim 27 in the '787 patent describes a single card designed for and capable of performing a single task—that is, a separate loyalty card.

Accordingly, I respectfully recommend that the Court adopt the following construction of "loyalty card": A card, separate from a card used to purchase goods or services, used to reward a consumer's loyalty account at the point of sale in real time as a purchase takes place.

*c.* "Preselected Information Receiving Device"

| **"preselected information receiving device"** ('787 Patent: Claim 31) | | |
|---|---|---|
| Claim 31, Step E:<br><br>"e. transmitting said information to a preselected information receiving device in order to receive said information." | | |
| **Alexsam's Proposed Construction** | **MasterCard's Proposed Construction** | **The Court's Construction** |
| A device which has been selected in advance so that it can receive data. | A device, other than the pre-existing standard retail point-of-sale device, preselected for receiving the requested information, such as an electronic mail device, facsimile device, or voice response device. | A device, such as an electronic mail device, facsimile device, or voice response device, selected in advance from among two or more devices to receive the requested information. |

The central difference between the parties' proposed constructions involves whether a POS device may be a "preselected information receiving device." The Court has an additional concern with respect to whether either of the proposed constructions sufficiently addresses the requirement that the device be selected in advance.

As indicated above, the claim refers to preselected information receiving devices without describing what those devices might be. The relevant portion of the specification states that the "means" for receiving information "may include electronic mail, facsimile, voice response, and other similar means." '787 Patent 10:33-34. Alexsam's expert contends that a person of ordinary skill in the art would understand the claim to be referring to any electronic device capable of receiving and displaying the type of information envisioned in the invention, including existing POS devices. Declaration of Ivan Zatkovich ("Zatkovich Decl.") ¶ 40, Docket Entry 165-1 (noting that "a point-of-sale device . . . would be an obvious choice since hospitals and doctor[']s offices both contained point-of-sale devices at the time of the invention," and that

"[m]any point-of-sale devices [at that time] . . . had the multi-line displays capable of receiving and displaying digital text information"). MasterCard contends that, because POS devices are not among those listed in the relevant portion of the specification, a person of ordinary skill in the art would understand the claim to exclude POS devices from the definition of a preselected information receiving device. MasterCard's Responsive Claim Construction Brief ("Def.'s Reply") at 10, Docket Entry 167.

As noted above, when determining the scope a patent, the claims are of "primary importance." *Phillips*, 415 F.3d at 1312 (quoting *Yeomans*, 94 U.S. at 570). Nothing in the language of Claim 31 excludes a POS terminal from the definition of information receiving device, or suggests that electronic mail, facsimile, and voice response devices more closely fit the terms of the claim. Although the specification explicitly lists electronic mail, facsimile, and voice response as included devices and makes no mention of POS devices, limitations from the specification should not be read into the claims. *Anchor Wall Sys.*, 340 F.3d at 1306. Accordingly, while I conclude that listing the devices identified in the specification as examples may be helpful to a finder, a construction that explicitly excludes POS devices is not supported by the ordinary and customary meaning of the claim terms.

As I expressed at the claim construction hearing, I remain concerned that neither party's proposed construction sufficiently describes the meaning of a "preselected" device. Tr. 111:2-20. The term "preselected" requires that there has been a "selection," or an affirmative act designating a device as the one to which information should be sent. As Alexsam acknowledges, though, the patent does not describe a process or mechanism for the preselection of any device. *Id.* 121:5-7. Accordingly, if the claim were construed as Alexsam suggests, every receipt of information by means of a POS terminal, whether the POS device was affirmatively

"selected" to receive the information or not, might arguably be a covered transaction. Indeed, Alexsam seems to argue that every receipt of information over a POS device, even if the information was received by that device simply because it was used to request the information, would be a covered transaction. *Id.* 112:12-19. To avoid this overly broad construction, the Court's proposal requires that there be a selection of a device from among alternatives.

Accordingly, I respectfully recommend that the term "preselected information receiving device" be construed as follows: A device, such as an electronic mail device, facsimile device, or voice response device, selected in advance from among two or more devices to receive the requested information.

### IV. The Term "Transmitting a Rejection Code to said Point-of-Sale Device if said PIN Entered Does not Correspond to said Identification Number" ('787 Patent, Claim 31) Does not Render that Claim Indefinite.

A patent's specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor . . . regards as the invention." 35 U.S.C. § 112(b). In other words, patents have a "definiteness requirement." *See Nautilius, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124-25 (2014) (discussing 35 U.S.C. § 112(b) and noting that "[a] lack of definiteness renders [a patent or claim] invalid"). To satisfy this requirement, a patent's claim, when "viewed in light of the specification and prosecution history, [must] inform those skilled in the art about the scope of the invention with reasonable certainty. The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable." *Id.* at 2129.

MasterCard contends that Step D of Claim 31, "transmitting a rejection code to said point-of-sale device if said PIN entered does not correspond to said identification number," is indefinite. Def.'s Mem. at 20-21. First, MasterCard argues that the specification does not define

the term "rejection code" and does not describe the transmission of any code at all. *Id.* at 21. Second, MasterCard points out that the term "said PIN entered" lacks an antecedent that might inform the reader what the "said" PIN might be. *Id.* Third, MasterCard contends that Steps D and E of the claim are incompatible with each other, because Step D describes transmission of a rejection code, whereas Step E describes transmitting information, presumably after confirmation that the PIN entered and the card user's identification number match. Tr. 157:5-12. MasterCard argues, in other words, that Claim 31 could be infringed only if Step D were not performed, but that the claim as written indicates that both Steps D and E need to be performed to meet the requirements of the claim. Thus, argues MasterCard, the claim is indefinite because there is "no way to determine how [a person could] infringe" it. *Id.* 158:4-8.

Whether a claim is indefinite "must be decided in context." *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006). Thus, the failure to provide an antecedent basis for a term does not necessarily render a claim indefinite. *Id.* Here, when considered in the context of the entire patent, the term "rejection code" is readily understood as a code that is transmitted when the PIN number entered is incorrect, with the result that the desired transaction may not be completed. In the context of Claim 31, which describes an "information retrieval card," a rejection code indicates that the desired information will not be received. This interpretation of the claim term is confirmed as one that would be understood by a person of ordinary skill in the art by Alexsam's expert. Zatkovich Decl. ¶¶ 26-28. Similarly, a reading of the claim, particularly Step B, clarifies that "said PIN entered" refers to the entry of a PIN assigned to the card to verify the identity of the user. Finally, as I noted at the claim construction hearing, Step E is clearly meant as an alternative to Step D. Tr. 157:13-14. Per Step D, if the incorrect PIN is entered, a rejection code is transmitted; per Step E, if the correct PIN is entered,

the information is sent to the preselected device. Both cannot logically occur at the same time. Contrary to MasterCard's contention, it is clear that what the patent claims, though perhaps inartfully, is a system with steps D and E as alternative outcomes, depending on whether a correct PIN is entered. It is reasonably clear, therefore, that to conduct a covered transaction, one would have to reach Step E, and avoid rejection under Step D. Alexsam has now stipulated that a rejection under Step D would not result in a covered transaction under the license agreement. Alexsam Letter at 3-4.

For the reasons stated above, the Court concludes that the phrase "transmitting a rejection code to said point-of-sale device if said PIN entered does not correspond to said identification number" informs a person skilled in the art about the scope of the claimed invention with reasonable certainty. I therefore respectfully recommend that MasterCard's contention that Claim 31 of the '787 Patent is indefinite be rejected and that this phrase be given its plain meaning.

## CONCLUSION

For the aforementioned reasons, I respectfully recommend that the Court adopt the following constructions of the following claims:

1. "debit/medical services card": A card that can function as part of a multifunction card system as both a debit card and a medical services card, the different functions depending upon the database the system is directed to access when the card is used.

2. "loyalty card": A card, separate from a card used to purchase goods or services, used to reward a consumer's loyalty account at the point of sale in real time as a purchase takes place.

3. "preselected information retrieval device": A device, such as an electronic mail device, facsimile device, or voice response device, selected in advance from among two or more devices to receive the requested information.

I further respectfully recommend that the Court reject MasterCard's contention that the phrase "transmitting a rejection code to said point-of-sale device if said pin entered does not correspond to said identification number" renders Claim 31 of the '787 patent indefinite under 32 U.S.C. § 112(b).

Any objections to the recommendations made in this Report must be submitted within fourteen days after filing of the Report and, in any event, no later than June 25, 2018. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. Proc. 72(b)(2). Failure to file timely objections may waive the right to appeal the District Court's order. *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (discussing waiver under the former ten-day limit).

_____/s/_____
Steven M. Gold
United States Magistrate Judge

Brooklyn, New York
June 11, 2018

U:\#VAR 2017-2018\Alexsam V. Mastercard (15cv2799) (ILG)\Claimconstruction\Claimconstruction_Alexsam_V_Mastercard_Draft3.Docx